Federal Rule of Civil Procedure, Rule 26

Disclosure of expert Testimony

**Case:**        SOLOMON COLEY and ARSHANKE HALL individually and on behalf of their minor children JEWEL COLEY and A'BRIANNA COLEY , Plaintiffs  vs  CITY OF BOSSIER CITY, OFFICER CHAD BOYETT AND SGT. FAULKNER, DEFENDANTS

Case No. C- 17-1553

**Name:**        Terry Anderson

**Company:**     Keli's K9's LLC

Training, Service Canines and Consulting

1566 County Road 4510 Hillister, Texas 77624

I, Terry Anderson, have been retained as an expert witness for the City of Bossier City, Louisiana, in this action. I have been asked to consider the facts in this case and form opinions regarding:

*Negligence, Excessive Use of Force and Failure to Train, in response to a duty to serve and protect the general public from attacks by a police dog during and after the apprehension, responsibility to properly purchase, train, promulgate appropriate adequate Policy and Procedures, handle and control an acceptably trained certified police dog, Failure to respect and protect the Plaintiff's Civil Rights and the Defendant's use of force.*

EXHIBIT

23

tabbies

I.    **Expert's Background and Experience**

- I am the Trainer/Handler for Keli's K9's LLC. We train single purpose and dual purpose canines for Law Enforcement Agencies. I also train dogs for private citizens in Basic, Intermediate and Advanced Obedience.
- We work our own service dogs in the private sector searching for narcotics and explosives.
- We provide Training for LE agencies regarding all areas of police service dogs and tactics.
- I began my career in 1988 at Pasadena Police Department (PPD) where I worked until I retired as a Sgt. in 2013. I became a certified instructor through the State of Texas Commission on Law Enforcement Standards in 1989.
- I became a canine handler in 1991 and attended numerous canine training schools. I became a certified canine trainer in 1994 and head trainer for PPD that same year. I remained the head trainer for PPD canine Program until just prior to my retirement in 2013. I was responsible for canine procurement, testing and evaluations, budgets, weekly unit training, selection of handlers, handler training programs, monthly departmental reports, medical consultations, Policy and Procedures, mission specific training and operational deployments, and personnel evaluations as well as proficiency assessments.
- I was elected President of National Police Canine Association (NPCA) in 2004 and I still retain that elected position. I spent three years on the Standards Committee (SC) for NPCA. The SC was responsible for developing certification standards for NPCA.  I oversee a 1400-member organization with an annual budget exceeding $200,000.00, where we provide training and certifications to LE entities. I annually attend a Legal Update Class that we provide to our members. I teach all disciplines related to canine training to our members.
- I also was a member of PPD SWAT team from 1994-2013. I remained on SWAT following my promotion and was moved to PPD Special Operations Division Sgt and responsible for forty operators in Canine, SWAT and EOD. This responsibility entailed overseeing unit training of all three units, budgets, procurement of equipment, personnel selections and operational deployments. I am employed as an instructor for SKIDDS and travel all over the United States teaching SWAT operators and canine teams how to interact during tactical deployments.
- During my career I have testified in City, State and Federal Courts and have been retained previously as an expert witness on the following cases:

    De La Rosa v. City of Tucson, Case No. C20164674
    George William Rios v. City of Tucson, No.  CV-17-00003-JAS-PSOT
    Raymond Collins v. Officer Barry Pedersen, No. 4-17 -cv- 00157-RCC
    Daniel Tegart v. Officer Jeff Rusmley, No. CV-17-00472
    Raymond Roberts v. City of Albuquerque, Case No. 1:18-cv-00253-JAP-SCY
    ROBERT C. MOORE v. NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)
    Civil Action No: 2018 CA 006324B

- I have been on three Federal Boards which are responsible for developing industry best practices. I was on the Executive Board for SWGDOG and NEDCAB. Currently I am one of 25 members for OSAC.

II.   **Below is the data and information I considered in forming my opinions:**

1. 000001-47 Investigation File (Cad Call information & reports)
2. 000001-310 CBC Responses to RFPD
3. 000400-702 Training Records- Boyett
4. 000703-1070 Training Records- Faulkner
5. 002942-3089 Personnel Files- Boyett
6. 003090-3521 Personnel Files- Faulkner
7. 004558-4571 IA-Faulkner 03-IA-91
8. 004572-4614 IA-Faulkner 14-20
9. 005090-5091 IA- Boyett- Report 3-18-13
10. 005092-5093 IA- Boyett- Report 5-29-14
11. 005094-5097 IA- Nelson,Boyett-2015
12. 005101-5107 CAD Calls Boyett
13. 005108-5119 CAD Calls Faulkner
14. 005131 Disciplinary Action- Boyett
15. 005132-5138 Disciplinary Action- Faulkner
16. 005140 Disciplinary Action- Freeman
17. 005151-5189 TORRES- General Info from Disk
18. 005190-5216 Torres Incident Reports
19. 005217-5243 Torres Bite - Andrew Bayles
20. 005244-5247 Torres Bite – Womack
21. 005248-5265 Torres Bite- Dunkentell
22. 005266-5269 Torres bite- Fred Carter
23. 005270-5271 Torres bite-Cooley
24. 005272-5310 Torres Medical
25. 005311-5408 Boyett-Torres Training
26. 005409-5431 Officer's Training w/ Torres
27. 005432-5588 Torres Training
28. 005589-5688 Training Report Torres
29. BOSSIER PARISH INCIDENT (Criminal History)
30. CADDO PARISH (Criminal History)
31. ARSHAKNE HALL deposition
32. OFFICER BOYETT deposition
33. OFFICER CISCO deposition
34. OFFICER FAULKNER deposition
35. OFFICER FREEMAN deposition
36. OFFICER GAYDOS deposition
37. OFFICER ORTIZ deposition
38. OFFICER PROVOST deposition
39. SOLOMON COLEY deposition

40. Scanned Documents (1) training report
41. Scanned Documents training report
42. PHOTOS
43. [1] COMPLAINT
44. [6] Answer
45. [19] First Amended Complaint
46. 4 1 2017 FREEMAN CHASE CAR TO CAR
47. 4 1 2017 FREEMAN CHASE INFORMATION CHANNEL
48. 4 1 2017 FREEMAN
49. 15-01 – BCPD Use of Force Policy
50. CLINGER MED RECS
51. COLEY PLS EXP REPORT (Plaintiff's Expert report)
52. COLEY TOTS TO TEENS
53. COLEY UH RECS
54. CONT FAM SRVCS
55. JENNINGS MED RECS
56. BCPD K-9 POLICY
57. Disk 1 of 6, C00400 A thru (Disk of MVS and BWC)
58. 5-22 DISC. RESP-1 (Answer to Plaintiff's Interrogatories)
59. 5-22 DISC. RESP-2 (Agreement between BCPD and Leroy Azlin for training, payment records, receipts)
60. 5-22 DISC. RESP-3 (Payment receipts, Course Outline)
61. 5-22 DISC. RESP-4 (Training records Eric Sproles)
62. 5-22 DISC. RESP-5 (Training records Eric Sproles)
63. 5-22 DISC. RESP-6 (Training records Eric Sproles)
64. 5-22 DISC. RESP-7 (Training records Eric Sproles)
65. 5-22 DISC. RESP-8 (Training records Eric Sproles)
66. 5-22 DISC. RESP-9 (Training records Eric Sproles)
67. COLEY (1) (Cad Calls and Incident reports)
68. COLEY (2) (Cad Calls and Incident reports)
69. COLEY (3) (Cad Calls and Incident reports)
70. COLEY (4) (Cad Calls and Incident reports)
71. COLEY (5) (Answer to Plaintiff's second set of interrogatories)
72. COLEY (6) (Canine Daily Report: On Duty Dogs, 2016)
73. COLEY (7) Undetermined blank page)
74. COLEY (8) (Canine Daily Report: On Duty Dogs, 2017)
75. COLEY (9) (Canine Monthly report, DMVR Policy, BWC Policy, Pursuit Policy, Boyett Schedule, CAD Call and reports)
76. 5-13-19 Erica Proby - Statement of Non-Appearance
77. 5-13-19 Lawanda Perkins deposition
78. 104353_5-21-19 Randall Glen White, Jr., M.D. deposition
79. Capt. Aguirre's deposition
80. Leroy Azlin deposition Transcript Pt. 1
81. Leroy Azlin deposition Transcript Pt. 2
82. 5-22 DISC. RESP-1 (Answer to Plaintiffs Interrogatories)
83. CH ANS. TO 4th ROGS & RFPD (Answer to Interrogatories and Response)
84. PLS answers to Roes and RFPD
85. PROBY TRANSCRIPT

III.    <u>**Here are the facts presented to me and upon which my opinions are based.**</u>

Primary Participants:

- **Trevier Perez Williams** B/M 03-18-91, 2871 Joust Drive Shreveport, La. the defendant who fled from Bossier City Police Officers and was later charged with multiple felony crimes (NOTE: Not a named person in this suit)
- **Solomon Coley** B/M 03-02-85, 541 E. Stoner Street #143, Shreveport, La. Father of Jewel Coley
- **Jewel Coley** B/F 06-21-11 1319 Acorn Street Shreveport, La. The Child who was bitten by Canine Torres
- **A'Brianna Coley** B/F 05-24-2013 1319 Acorn Street Shreveport, La. Sister to Jewel who was present when Jewel was bitten
- **Arshakne Quadrell Hall** B/F 1319  Acorn Street Shreveport, La. Mother of Jewel and A'Brianna
- **Officer Chad Boyett, City of Bossier City Police Officer, canine handler**
- **Sgt. Faulkner, City of Bossier City Police Officer**

IV.    <u>**Incident Summary:**</u>

1. On 04-01-2017, at approx. 2121, Officer Provost of the Bossier City Police department observed a white Honda Civic (LA Temp # 16800457) driving with no head lights. As he attempted to stop the vehicle it refused to stop and a vehicle pursuit ensued.
2. During the pursuit Officer Provost was the lead unit pursuing the vehicle until Canine Officer Boyett was able to take over the lead unit in the pursuit.
3. The pursuit continued through Bossier City and came to an end in a parking lot at 541 E. Stoner, Shreveport, La.
4. As the white Honda entered the parking lot at 541 E. Stoner, the two occupants of the vehicle jumped out of the vehicle, as it continued to roll forward in gear, and fled from the pursuing officers on foot.
5. As the passenger exited the white Honda, Officer Boyett saw that he was armed, carrying a handgun.
6.  Canine Officer Boyett exited his police unit and gave canine Torres his command to apprehend/bite the driver, who was later identified as Trevier Perez Williams.
7. Williams fled west bound on the sidewalk between several apartment buildings towards Easy street. Officer Boyett was directly behind the suspect as Torres chased him through this area.
8. As Williams ran through the apartment complex and crossed Easy Street, he ran right into the exact area where Solomon, Jewel and A'Brianna were walking southbound on Easy Street.
9. Solomon and his daughters were walking home from a nearby location after having attended a birthday party.

10. Officer Boyett observed canine Torres pursuing Williams and make physical contact with him in the lower leg as he crossed a sidewalk, on the west side of Easy street.
11. Officer Boyett stumbled as he jumped down a retaining wall and momentarily lost sight of canine Torres and the suspect.
12. Officer Boyett heard a female voice saying "he's biting the baby". Once he regained sight of Canine Torres, he realized that Canine Torres was biting a subject other than Williams.
13. Officer Boyett, without any hesitation, hastily ran towards Canine Torres.
14. Canine Torres knocked Williams down but apparently did not bite him. Instead he transitioned to Jewel, the little girl who happened to be standing right by Williams when Torres hit him.
15. Solomon, Jewel's father, grabbed canine Torres and attempted to get him to release his daughter. Officer Boyett immediately ran to canine Torres to stop him from biting Jewel.
16. Once Officer Boyett had direct, physical control of Torres, he gave him his release command. Canine Torres released his bite and Officer Boyett pulled him away from their immediate area and called for an ambulance, for medical treatment.
17. The fire department arrived and treated Jewel's injuries and then transported her to the hospital.

## V.    Professional Opinion:

The following are my professional and expert opinions, which I will offer in this case, and the basis and reason for those opinions.  My professional and expert opinions are based on the information I reviewed as well as my training, experience, expertise, education and familiarization with professional publications. It is my opinion that:

### Opinion #1

*In my professional opinion the utilization of Canine Torres as a less than lethal force option to arrest Williams was reasonable, lawful and consistent with modern police practices, industry standards and in accordance with State and Federal Law, Bossier City Police Department's (BCPD's) General orders, Use of Force Policy and Canine Policy. Officer Boyett had NO intention of his canine partner Torres biting Jewel. Obviously, Canine Torres acted on his own with no direction from the defendant causing this unintentional bite; therefore, **the defendant is NOT responsible for violating the plaintiff's civil rights.** (refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At \*1 (5th Cir. Sept 10, 2015 and Montanez v. City of Orlando, 678 F. App'x 905-911 (11th Cir. 2017)*

Police Service Dogs have an important role in Law Enforcement.  Their role is multi-faceted and encompasses responsibilities from public relations, education, detection of hidden odors, a static presence of deterrence and use of force options.

State and Federal Laws, individual departmental policies and procedures and various departmental guidelines govern how police service dogs are utilized on the streets and in the

industry. Industry standards are observed by agencies that utilize canine teams in Law Enforcement.

Canines are commonly deployed to detect hidden human odor as well as other illegal substances or dangerous items such as explosives.

Their intelligence, willingness to learn and proven ability to accept and obey commands provides officers another tool to successfully complete their tasks. Their physical capabilities such as agility, speed, temperament and inherent character traits improve officers' ability to locate hidden criminals, and increase the safety of officers, the person they are searching for and citizens. Canine teams are commonly utilized in departments "Force Continuum" as less than lethal options.

Officer Boyett was employed by the City of Bossier City as a Police Officer at the time of this incident. Officer Boyett was on duty responding to calls for service via departmental policies that require them to enforce City, State and Federal laws and protect the citizens of Bossier City. While on active duty status this felonious vehicle pursuit occurred and Officer Boyett responded to the area to assist in this case.

Although this Incident began as a simple, non-moving traffic offense it soon turned into an aggravated felony vehicle pursuit which is serious in nature and a threat to the safety of officers and citizens. Speed was a minimal factor during this felonious pursuit; however, Williams continued to disregard the safety of himself, his passenger, the officers pursuing him and the general public as he intentionally violated traffic laws such as stop signs, red lights and traffic flow directions thus creating the threat and level of serious crime.

At 2125 Officer Boyett and Canine Torres took over the number one or lead spot in the vehicle pursuit. This position allows the canine unit to be unimpeded in visualizing the suspect vehicle. It also allows the canine unit to quickly, visually identify a person who exits the suspect vehicle. During the pursuit Canine Torres can be heard on Officer Boyett's MVS whining and excited. This behavior is an indicator that Canine Torres is anticipating being utilized to apprehend someone inside that vehicle.

As the pursuit continues south in the 1300blk of Easy Street there is no obvious pedestrian traffic along the roadway in plain view. As the white Honda continues to evade and eventually enters the parking lot at 153 Stoner both the driver side door and the passenger side door open, confirming to the officers involved, that both subjects were preparing to exit the vehicle and continue fleeing on foot. *(Boyett Deposition, p. 86 9-25, p. 87 1-6)*

According to Officer Boyett's deposition he again visually cleared this area for any bystanders knowing he was likely going to deploy Canine Torres. As the vehicle slowed but kept moving, he observed the un-identified passenger exit the vehicle with a firearm in his hand and flee north east through the parking lot and into the apartment complex. *(Boyett MVS and Deposition page 85, 16-23)*

Simultaneously, he observed Williams exit the driver side of the vehicle and flee on foot. At this point in time, in a matter of seconds, Officer Boyett must analyze the situation and make an immediate decision. These decisions are made based on his current observations, knowledge, training and experience.

Officer Boyett knew the passenger was armed with a firearm so he must assume that the driver was armed with a firearm also. During the pursuit near the apartment complex he did not observe any obvious pedestrian traffic near the street or in the area and as the suspect vehicle entered the parking lot at 153 Stoner he did not see anyone in the area.

All that information combined along with these factors are involved in making his decision: the severity of this crime, the immediate threat posed to officers and others, the fact that both suspects were actively fleeing officers. This satisfies all the components of *Graham v. Conner, (490 U.S. 386, 394 1989) and Smith v. City of Hemet, (394 F.3d 689, 702 {9th Cir. 2005})* The facts and circumstances, which were legally relevant to the "objective reasonableness" determination, are only those that were known to the officer at the time force was used.

The imminent threat to officers and others existed because of the serious nature of the crime and knowing the suspects were armed with firearms. The facts and circumstances that were known to Officer Boyett and the potential for Williams to be armed with a weapon provided the utilization of Canine Torres without a verbal canine warning was a justified and reasonable Use of Force.

**The deployment of canine Torres was justified, lawful and in accordance with State and Federal Laws, Bossier City PD Canine Policy as well as the Bossier City PD Use of Force Policy, The Bossier City General Order and Industry Standard.** *(Crenshaw v. Lister 556, F.3d, 1282 5th Cir. 2009 and Escobar v. Montee 895, F.3d, 387, 394 5th Cir. 2018. Other References below)*

*Louisiana State Legislature: Code of Criminal Procedure*

*Art. 218.  Method of arrest without warrant*

*A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest.  A private person, when making an arrest, shall inform the person to be arrested of his intention to arrest him and of the cause of the arrest.*

*The officer or private person making the arrest need not so inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission or after an escape, or flees or forcibly resists before the officer or person making the arrest has an opportunity to so inform him, or when the giving of the information would imperil the arrest.*

*Art. 220.  Submission to arrest; use of force*

*A person shall submit peaceably to a lawful arrest.  The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.*

*Bossier City Policies and General Orders*

*Canine Policy:*

    *A.  Patrol*

        *5.  K9 teams shall respond to and may deploy at the following,*

            *c) events in progress or that have just occurred*

            *e) Felony crimes in progress or that have just occurred*

    *C. Use of Force Policy:*

        *1. Use of specially trained police k-9s for law enforcement responsibilities constitute a real or implied use of force. In this, as in other cases, officers may only use that degree of force that appears reasonably necessary to apprehend or secure a suspect as governed by the Department's Use of Force Policy*

    *Arrest Policy:*

    *V.  Arrest by Officer Without Warrant*

        *A.   A peace officer may, without a warrant, arrest a person when,*

            *1.   The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be immediately or on close pursuit*

            *2.   The person to be arrested has committed a felony, although not in the presence of the officer.*

    *IX. Method of Arrest without a warrant*

B. *The officer making the arrest need not inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission or after an escape, or flees or forcibly resists before the officer making the arrest has the opportunity to so inform him, or when the giving of the information would imperil the arrest*

*Use of Force Policy:*

*IV. Procedures*

    A. *Use of Force, force of any kind shall only be used in the following circumstances,*

        1. *In self defense or in defense of innocent persons but only to the degree which is immediate and reasonable*

        2. *To effect the lawful arrest to the extent that the force is reasonable and necessary to overcome any resistance or threatened resistance of the person being arrested.*

        3. *To prevent the flight or escape from an arrest or officer may use the same force to prevent the flight or escape of a lawfully arrested person and is reasonable for the arrest*

Officer Boyett had no choice but to effect this arrest in the fastest and safest manner possible; Nevertheless, deploying Canine Torres without a verbal warning to stop Williams from fleeing was prudent, justified and acceptable under U.S. case law and industry standards. Regardless of departmental policies, no officer is required to place himself in a lethal situation by announcing his presence or immediate location to a suspect that is known to be armed. Officer Boyett stated in his deposition that he saw the passenger suspect exit the vehicle carrying a firearm and knew that he had no choice but to believe that Williams was armed also. In fact, Williams was armed.

Officer Boyett stated during the final moments of this pursuit he had not observed any bystanders outside in this area. *(reference: Officer Boyett Deposition page 123 line 4-7)* Officer Boyett advised when Canine Torres was released to apprehend Williams, he was between 65-70' away from them. Canines learn from association and repetition. Through my training/experience in this situation I strongly believe that Canine Torres exited his unit and immediately identified Williams as he fled. My experiences have been that my seasoned canine partners are watching the events unfold as the pursuit develops. Knowing that their target is inside the vehicle in front of them my canine partners are watching and waiting for the suspect

to exit that vehicle and flee on foot. Typically, an experienced canine that has been in this situation previously makes the positive identification of the fleeing suspect on his own; however, it is the handler's responsibility to ensure that the canine has made the proper target identification.

As Officer Boyett exited his unit and opened the back door for Canine Torres, he ensured that Canine Torres had positively identified Williams as his target. By listening to his verbal commands on his MVS Officer Boyett never corrected Canine Torres, he only gave him his apprehension command. These commands mean that Canine Torres correctly identified who he was commanded to pursue. This action is visually caught on Officer Provost's MVS. The recording clearly shows when Canine Torres exited the unit, he ran right beside Officer Boyett until they cleared the last private vehicle in the parking lot next to where Williams was last seen running. Officer Boyett is pointing in the direction and moving in the direction behind Williams and Canine Torres was able to make a clear visual contact with Williams.

Starting from behind Williams and the speed at which Canine Torres can reach in his pursuit created a distance between Canine Torres and Officer Boyett. As the foot chase continued outside of the apartment complex Williams crossed a public roadway and ran directly into the immediate vicinity of the Plaintiff Jewel, her father and sister. Officer Boyett saw Canine Torres run directly into Williams and knock him down. At the same time, Officer Boyett jumped off a retaining wall and he stumbled causing his view to be momentarily blocked by a parked vehicle.

In reviewing the MVS provided to me Sgt. Faulkner's MVS clearly shows Williams running across the street being chased by Torres, the physical contact between them and Williams getting knocked to the ground. Williams immediately got up and continued running in the opposite direction from Canine Torres.

Due to the immediate proximity of Jewel to the exact location where Canine Torres contacted Williams, for whatever reason, Canine Torres was not able to bite Williams and hold on to that bite: Torres transitioned and bit Jewel. There is no conclusive answer to this unfortunate incident and an exact supposition is impossible. There are many factors that could have played a role in this incident, an awkward positional contact, reduced visual content due to darkness, confusion created by the number of people in that exact area or the suspect odor in the immediate vicinity of Jewel resulted in an accidental bite.

In reviewing the medical records provided to me, prior to this accidental bite and following the bite, there is no health reason why Canine Torres could not physically perform his duties as a police canine. BCPD goes above and beyond to ensure the health care of their canines as proven by the number of medical records and preventative care they receive.

Officer Boyett's deployment of Canine Torres was to capture, as safely as possible, an armed fleeing felon not to bite Jewel. Any thought that Officer Boyett intentionally directed or allowed Canine Torres to bite Jewel is absurd. Canine Torres had already identified, chased and contacted Williams as he was directed by Officer Boyett. Canine Torres's action after that initial contact with Williams can only be considered an accidental bite.

When Officer Boyett re-established visual contact with Canine Torres and realized he was biting someone other than Williams his complete attention went from pursuing him to removing Torres from the bite. Officer Boyett observed Solomon, Jewel's father physically grabbing Torres by the collar, lifting him of the ground and hitting him with an open hand across the top of his head. *(Boyett Deposition p. 99 11-16)*

Officer Boyett immediately ran to get physical control of Canine Torres. He grabbed Torres and gave him his out command. Officer Boyett stated when he grabbed Canine Torres the canine was not actually biting Jewel but had her by her shirt. *(Reference: Boyett Deposition page 122, line 15-22)* Officer Boyett advised Canine Torres immediately released the bite when he gave his release command and believed he was only biting Jewel for approximately three seconds. Through his training and experience Officer Boyett had the presence of mind to understand that if he had verbally called Torres off the bite from a distance, he most likely would have engaged Solomon defensively because he was attacking him. Officer Boyett's prudent and immediate response reduced the already unfortunate incident by not making it worse.

Officer Boyett secured canine Torres with his leash and after ensuring that medical services were contacted, he returned Canine Torres to his unit and secured him there. Officer Boyett also ensured that he advised Sgt. Freeman on the scene that Torres had bitten a little girl.

### Opinion #2

> *In my opinion the Bossier City Police Department has **NOT** failed to adequately train Officer Boyett and Canine Torres.*

In reviewing Officer Boyett's personal training records he was hired by the Bossier City Police Department (BCPD) in 09-2008 and I find his history of training to be extensive. He is well trained in most every aspect of Law Enforcement. He has a plethora of different training records found. This training includes internal and external training.  Officer Boyett has had no disciplinary actions and two complaints in his career. Both complaints resulted in him being exonerated. This is an outstanding validation of his character and demeanor which attests to his decision-making capabilities. By all accounts and documents produce for my evaluation Officer Boyett is a conscientious and exceptional officer.

Officer Boyett was assigned to BCPD canine unit on 11-29-15 and has received volumes of training specific to police canines. Canine Torres was put into service with Officer Freeman in 2013 after they successfully completed a 120 Basic Canine Handlers Course from "Four A Canine", taught by Leroy Azlin. After reviewing all the training records from both Officer Freeman and Officer Boyett, it is abundantly clear Canine Torres and both handlers have been exposed and trained under a leading trainer in the Law Enforcement Canine Industry. The voluminous records indicate that Canine Torres is very capable of being a police service dog and highly trained. He has successfully completed courses of training with Officer Freeman and Officer Boyett.

In Leroy Azlin's deposition he states that he is an independent trainer/evaluator hired by the City of Bossier City Police Department to observe the canine units training and make any recommendations he believes are necessary for this unit. Further review of his deposition he advises that one of the areas he is always aware of is the bite ratio of each canine team. Mr. Azlin advises that the bite ratio is "I know their bite ratio is almost nil". When asked how he knows this he states, "Because they arrest a lot more people than they use the force of the dog on". He states they advised him of their arrests with their canine partners and he knows about every dog bite. *(refer Azlin depo, page 19 thru 24)*

In reviewing all the training records and utilization records of Canine Torres when he was assigned to Officer Freeman and then Officer Boyett, Canine Torres has only had five instances where he was forced to bite suspects. In correlation to the number of arrest that Canine Torres has accumulated since he went into service with the BCPD Canine unit that number is pointedly lower according to Mr. Azlin.

Mr. Azlin has a long-established career as a canine handler, trainer, supervisor and is a published author regarding canine detection training. It is abundantly clear that Bossier City Police Department has ensured their canines and handlers are trained to a very high industry standard by a competent and qualified trainer. Considerable effort and expense have been put into BCPD canine unit with regards to training and certifications.

Canine Torres was purchased from a well-known, established vendor who accepts dogs based on its natural instincts and drives, their character and temperament and other pertinent traits. The vendor or his designee's then trains the canine to an accepted level of industry standards based on the buyer's predetermined requirements. Not every canine has this ability. It is obvious that to achieve these standards Canine Torres must be very levelheaded and demonstrate an enormous amount of acceptance to be controlled by the handler.

According to BCPD Canine Policy each canine team must successfully pass a certification with a recognized National Organization that has certifications that meet or exceed industry standards. Officer Freeman and Officer Boyett have both received Patrol 2 certification with Canine Torres from the National Police Canine Association. (NPCA) Officer Freeman and Canine Torres in 2013, 2014,2015. Officer Boyett and Canine Torres received Patrol 2 certification from NPCA in 2016 and 2017.

A level 2 Patrol certification from NPCA meets an INDUSTRY BEST PRACTICE which is the highest level of certification offered for patrol canines through the NPCA. The level of control needed to achieve this certification displays the enormous amount of control Officer Boyett possess regarding Canine Torres and Canine Torres's ability to clearly understand and act on commands by Officer Boyett.

The BCPD maintains departmental Policies and Procedure Manuals for their canine unit which established guidelines for training, certifications, deployments and all facets of record keeping for their canine teams. I have examined BCPD Canine Policy as well as their Use of Force Policy, Arrest policy and Pursuit policy. Although it appears that it has been several years since any

updates have occur in BCPD regarding their policies, BCPD maintains an above average written canine policy.

*Opinion #3*

*In my opinion Officer Boyett did **NOT** utilize Excessive Force nor was he negligent or grossly negligent in his actions regarding the deployment of Canine Torres to apprehend /arrest Williams. Officer Boyett had a duty to act in resolving this incident as it was known to him at the time. Officer Boyett had no intention for Canine Torres to bite the plaintiff. Obviously, Canine Torres acted on his own with no direction from Officer Boyett causing this unintentional bite. (refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At \*1 (5th Cir. Sept 10, 2015 and Montanez v. City of Orlando, 678 F. App'x 905-911 (11th Cir. 2017) The BCPD and its canine unit follow current law enforcement standards for policies, training customs, practices and procedures and state/federal Constitutional and statutory laws.*

Being the first police unit involved in this pursuit allowed Officer Boyett the advantage of an unobstructed view of the suspect vehicle, the areas surrounding the path the pursuit took and a clear visual of both suspects as they fled from the vehicle.

To properly evaluate this matter, we must consider several factors: Through his training and experience Officer Boyett knew that the suspect vehicle had committed felonious crimes of evading in a motor vehicle and had needlessly jeopardized the lives of officers involved in the pursuit and innocent citizens that it passed or came in contact with.

As the pursuit drove around the area of 153 Stoner, the apartment complex, there were no obvious pedestrians outside in the area. Officer Boyett's and Officer Provost's MVS provides a clear view off what they observed during the pursuit. There are no bystanders visible on their MVS as the pursuit entered the parking lot at 153 Stoner. As the pursuit entered the apartment parking lot, knowing that the suspects intended to flee from the vehicle on foot, Officer Boyett had a duty to act and arrest one or both suspects if possible. As the suspects exited the moving vehicle, clearly seeing that the vehicle was still in forward motion and that the passenger was armed with a handgun Officer Boyett knew they were now faced with an imminent lethal threat and potentially a deadly foot pursuit. This elevated the threat to a higher risk for the officers involved and any unknown persons the suspects could encounter.

In Graham v. Connor, an excessive force claim is analyzed under the "objective reasonableness" standard.  Objective reasonableness is determined considering the facts and circumstances confronting the officer, without regard to their underlying intent or motivation.  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Police officers are taught that the potential for violence exists until the suspect has been secured with handcuffs or otherwise rendered safe. Officers are trained on a continuing basis to

evaluate each situation as it presents itself as any event could escalate into a deadly force utilization.

Officers are provided with training as well as General Orders and Operating Procedures to guide them through each situation they encounter. Their training includes Policies on departmental Use of Force situations. These force continuums clearly define each level of force how/when it can be utilized in any given situation. *In my opinion, Officer Boyett's use of force in this case was objectively reasonable and within department guidelines; Therefore, his action to deploy Canine Torres to stop the fleeing felon and prevent him from committing violence on any innocent bystander he could contact as he attempted to escape is justified and in accordance with applicable laws and industry standards.*

Once Canine Torres contacted Williams knocking him to the ground, Torres had conducted himself as he has been trained; however, due to circumstances that are not factually verifiable Canine Torres, on his own without any command or direction from Officer Boyett transitioned from Williams and bit Jewel.

Officer Boyett had NO intention of Canine Torres biting Jewel; therefore, there is NO definable claim to Excessive Use of Force. Under these circumstances, in my professional opinion, Officer Boyett was neither negligent nor grossly negligent when he deployed Canine Torres to arrest Williams. It is clearly an unfortunate, accidental bite.

When Officer Boyett realized this incident had occurred he immediately took the safest action possible to stop the bite and eliminate the opportunity for another bite. Officer Boyett's reaction to physically controlling Canine Torres before giving his verbal out command is another display of his ability to think properly according to his training and experience in a high stress situation. Knowing the possibility of another bite existed if he did not establish hands on control of Canine Torres, Officer Boyett removed that from potentially occurring.

Through my training, experience and knowledge regarding canine bites, there are two certain facts:  1. The tissue damage Jewel sustained is VERY minimal for canine Torres to have been left on the bite for an extended time, 2. A bite for an extended period of time would result in significantly more tissue destruction

I have found that tissue damage is directly related to a plethora of factors.  For example: How confident a dog bites, the age and size of the dog, the condition of his teeth, his health, the duration of the bite, the location of the bite on the body and the number of times a dog has bitten a person.  Numerous environmental factors add to or detract from the actual bite.

Canine Torres being an experienced and confident Police Service Dog that has effected the arrest on multiple suspects during his five-year career I would expect his bite to be solid and capable of significant tissue destruction when he does bite; however, in reviewing the photographs and medical records provided to me the physical injuries that Jewel sustained were minimal, superficial as stated by the attending physician. *(Refer depo of Dr. White page 20 line 7-15)* The injuries appeared to be more superficial with two small punctures and scratches. There was no sutures and minimal bleeding. In my opinion these minor injuries could relate to

the fact that Canine Torres in no manner intended on biting her. *(COLEY UH RECS, Disk 1-6 C00400 A thru F)*

Per the BCPD Canine Manual, it clearly states that "ALL" canine Use of Force events the Canine Trainer and Canine Supervisor shall be notified immediately, followed by the appropriate report and use of force report. Sgt. Gaydos was notified and responded to the scene as well as the hospital where he met several times with Solomon Cooley. Officer Boyett submitted his supplemental report and use of force report according to departmental policy. It was reviewed by the chain of command and found not to be in any violation of BCPD policies and procedures.

*In my opinion, after reviewing the facts, I find that Officer Boyett's utilization of Canine Torres as a less lethal force option to arrest Williams was reasonable, lawful, proper and in accordance with industry standards, State and Federal Laws, BCPD's Use of Force Policy and BCPD Canine Policy. Even though an accidental bite did occur there is neither direct or indirect action on his part that would indicate in any manner any form of Negligence or Gross Negligence.*

The compensation I will receive for my study and testimony in this manner is:

SCHEDULE OF FEES-Terry Anderson-2019

a. All Case Preparation: $200.00/hour
b. Any Deposition: $300.00/hour
c. Court Room Charges: 4 hours standby waiting to testify is $500.00, 8 hours standby waiting to testify is $800.00 (hours past 8 for standby testimony will be billed at case preparation rate)
d. No charges accrue once called to testify. Charges do accrue for pre-testimony and post testimony if not released from court.
e. Consultation Fee: $250.00/hour
f. Travel Time: $75.00/hour Plus $0.56/mile
g. Retainer (for Expert work only): $3,000.00 (Non-refundable)
h. Non-disclosed Case Analyst Work: $200.00/hour

**VI.     I have testified as an expert witness at trial or deposition in the preceding 5 years.**

(refer to attached CV for further details)

**I have provided these opinions based on the information that I have reviewed, and I reserve the right to change, amend or supplement my opinion based on additional information.**

_____
**Terry Anderson – Keli's K9's**